# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cr-00047-MEO-DCK** |
| | ) | |
| **GERELL MICHAEL HART-SMITH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## SENTENCING MEMORANDUM OF GERELL MICHAEL HART-SMITH

Gerell Michael Hart-Smith is a young father with a bright future. For more than a decade he has allowed addiction and negative peer influences to control the course of his life. But he has accepted responsibility for his mistakes, identified the obstacles to his success, and resolved to make significant changes, both for himself and his family. He is ready to take control.

Although Mr. Hart-Smith is committed to change no matter what sentence he is given, he respectfully asks that the Court sentence him to time served and require him to participate in a year-long residential treatment program offered by FIRST at Blue Ridge. (Ex. 4; Ex. 5.) The program is perfect for Mr. Hart-Smith because it is designed to help residents develop the skills they need to break the cycle of substance abuse. It also provides vocational training in Ridgecrest, North Carolina, which will help Mr. Hart-Smith rebuild his life and contribute to society far from the negative peer influences he faces in Charlotte. Such a sentence would fulfill the purposes of sentencing far better than any additional term of incarceration.

## BACKGROUND

### A. Childhood and Underlying Offense

Mr. Hart-Smith was "raised in the church" by his mother and grandmother. (Ex. 2 at 1.) As a child, he was an honor roll student and participated in sports. (Ex. 5 at 1.) Unfortunately,

Mr. Hart-Smith drifted from the path of success when he began associating with negative peer influences in his neighborhood, leading to heavy marijuana use and multiple encounters with law enforcement.

At age 17, Mr. Hart-Smith was arrested and convicted for larceny of a motor vehicle. (Doc. 3-1 at 1.) He was sentenced to 5 to 15 months of incarceration, followed by 24 months of probation. At age 21, on April 2, 2022, Mr. Hart-Smith was arrested for possession of a firearm by a felon, the underlying offense conduct in this case. (Doc. 1-3 at 2.) On October 31, 2023, Mr. Hart-Smith was sentenced to time served and twelve months of supervised release. (Doc. 1-2 at 1.)

**B.     Performance on Supervised Release**

Following his release from federal custody, Mr. Hart-Smith had mixed success adjusting to supervision. He struggled to avoid marijuana and had difficulty finding a stable residence. But he "was honest about his struggles and expressed interest in improving his situation." (Doc. 2 at 1.) To address his substance abuse, the Court modified the terms of his supervision to require participation in a 180-day program with the Residential Reentry Center in Charlotte, which he entered on February 16, 2024. (Doc. 2 at 2.)

The residential program was highly effective. Probation reported "progress in [Mr. Hart-Smith's] thinking and actions." (Doc. 2 at 2.) He stopped using marijuana, obtained full-time employment, and earned a driver's license for the first time in his life. (Doc. 2 at 2.) In terms of substance abuse, the impact of the program lasted far beyond Mr. Hart-Smith's participation in the residential program. In contrast to his initial period of supervision, when he screened positive for marijuana five times in three months  (Doc. 2 at 1), after he began participation in the program, all of Mr. Hart-Smith's drug screens came back clean for more than six months (Doc. 3 at 5).

Unfortunately, Mr. Hart-Smith continued to associate with negative peer influences. These associations led to Mr. Hart-Smith's contact with the police in connection with a stolen vehicle, which in turn led U.S. Probation to file a violation petition on October 18, 2024. (Doc. 3.) Mr. Hart-Smith was arrested on December 17, 2024. (Doc. 7.) He pleaded guilty and was sentenced to time served on April 17, 2025, to be followed by a twelve-month term of supervision, including 90 days of home detention. (Doc. 13.)

Mr. Hart-Smith continued to struggle while on home detention. He screened positive for marijuana on three occasions between May 20 and July 2, 2025. (Doc. 14 at 3, 6.) He admitted to probation that he resumed using marijuana while incarcerated for his first violation, and that he used the substance regularly while on home detention. (Doc. 14 at 6.) Following a search of his residence on June 16, 2025, and a review of his cell phone data, Mr. Hart-Smith also admitted to participating in selling marijuana. (Doc. 14 at 6.) U.S. Probation filed a second violation petition on July 30, 2025. (Doc. 14.) Mr. Hart-Smith was arrested on August 1, 2025. (Doc. 15.) He accepts full responsibility for the violations.

### C. FIRST at Blue Ridge

As Mr. Hart-Smith reflected on his circumstances, he resolved that his arrest on August 1, 2025 would be his last. He also applied to a year-long residential treatment program offered by FIRST at Blue Ridge, Inc. ("FIRST"), to address the two most significant obstacles that had thus far hindered his reintegration into society: his addiction to marijuana and his failure to distance himself from negative influences from his youth.

Significant features of FIRST's treatment program include the following:

- The campus is in Ridgecrest, North Carolina, far from the negative influences in Charlotte that have made it difficult for Mr. Hart-Smith to stay out of trouble (Ex. 4);

- "Active participation in 12 Step Self Help Fellowships and other Community Support Groups is mandatory" (Ex. 5);

- Participants are subjected to random drug screening (Ex. 4);

- Participants are trained in "life skills, anger management, parenting skills, and relapse prevention" using "[e]vidence based practices" (Ex. 5);

- Participants "earn their way through the program by participating in vocational training assignments for employers who contract with FIRST at Blue Ridge, Inc. as Vocational Training Partners"—there is no cost to the government (Ex. 5);

- Participants "learn marketable skills . . . and demonstrate the ability and desire to maintain gainful employment leading to re-integration with their families, independent living, or supportive housing" (Ex. 5);

- Program staff provide 24-hour monitoring and supervision services (Ex. 4); and

- Staff maintain communication with federal probation officers—"[a]ny deviation or violation is immediately reported" (Ex. 5).

On March 16, 2026, Mr. Hart-Smith was accepted to FIRST's long-term residential program. (Ex. 4.) In the acceptance letter, FIRST's Administrative Director opined that "Mr. Hart-Smith's ability to live a successful, productive, and drug-free life is excellent so long as he completes the FIRST program, stays in recovery, works hard, and attends his AA/NA meetings and follows the recommendations of the Clinical Team." (Ex. 4.)

### D. Support Network

Mr. Hart-Smith "has significant family support" from his grandmother, mother, siblings, and two children. His mother describes him as "a smart, funny, [and] loving" person who is "capable of anything." (Ex. 2.) She acknowledges his mistakes, but believes that he "has finally seen the error of his ways" and "now sees and feels the effect his absence has on" his children. (Ex. 2.) She views his acceptance to FIRST as a "chance to focus on changing his mind frame" and pave "a new pathway towards success." (Ex. 2.)

His girlfriend, Ms. Aneya Meyers, is another pillar of support. During Mr. Hart-Smith's incarceration, Ms. Meyers has seen him "hold himself accountable and accept constructive criticism with open ears, an open mind, and an open heart." (Ex. 3.) She describes him as "genuinely committed to becoming a better man, not just for himself, but for his family and

4

loved ones." (Ex. 3.) She fully supports his desire to start a new life away from negative peer influences in Charlotte, and has recently relocated outside of the city to help further that goal.

Ms. Meyers's devotion mirrors the support she received from Mr. Hart-Smith "[d]uring some of the most painful moments of [her] life," including the passing of her mother and the loss of a pregnancy. (Ex. 3.) His emotional and spiritual support during her seasons of grief "revealed his heart as a partner and as a father." (Ex. 3.) Based on her interactions with Mr. Hart-Smith, Ms. Meyers "genuinely believe[s] he is ready to reenter society as a productive, faithful, and family-oriented man." (Ex. 3.)

## **LEGAL STANDARD**

Upon finding that a defendant violated the terms of his supervision, the Court may revoke supervision and impose a term of incarceration. 18 U.S.C. § 3583(e)(3). "A district court has broad discretion when imposing a sentence," provided it limits its analysis to the factors applicable to revocation of a term of supervised release. *United States v. Webb*, 738 F.3d 638, 640 (4th Cir. 2013). The Court "may not impose a revocation sentence based predominately on the seriousness of the releasee's violation." *Id.* at 642. It "must consider the forward-looking ends of sentencing (deterrence, incapacitation, and rehabilitation), but may not consider the backward-looking purpose of retribution." *Esteras v. United States*, 606 U.S. 185, 196 (2025).

Rehabilitative needs are addressed through the terms of post-revocation supervision, not by lengthening the term of incarceration. *See Tapia v. United States*, 564 U.S. 319, 321 (2011) ("We consider here whether the Sentencing Reform Act precludes federal courts from imposing or lengthening a prison term in order to promote a criminal defendant's rehabilitation. We hold that it does."). The goal of rehabilitation is "important in determining whether a sanction other than a term of imprisonment is appropriate in a particular case." *Id.* at 332.

<u>**ARGUMENT**</u>

The Court should sentence Mr. Hart-Smith to time served, but require as a term of supervision that he complete the long-term residential treatment program offered by FIRST. Doing so would satisfy the "forward-looking ends of sentencing (deterrence, incapacitation, and rehabilitation)" better than any sentence involving continued incarceration. *Esteras*, 606 U.S. at 196.

I.  **FIRST's Long-Term Treatment Program Strongly Aligns with the Rehabilitative Purpose of Sentencing.**

Mandatory completion of FIRST's Long-Term Residential Treatment program would be the "most effective manner" of providing Mr. Hart-Smith the "correctional treatment" and "vocational training" he needs. 18 U.S.C. § 3553(a)(2)(D). Mr. Hart-Smith's repeated use of marijuana, both  immediately following completion of his underlying sentence (Doc. 2 at 1) and throughout his home detention (Doc. 14 at 5-6), is a clear indication that he needs help overcoming his addiction. His successful participation in the program offered by the Residential Reentry Center, followed by more than six months without a single failed drug screening (Doc. 3 at 5), demonstrates that Mr. Hart-Smith responds well to substance abuse treatment programs. The fact that FIRST provides robust vocational training and requires participation in a 12-step program—in a location far from the negative peer influences Mr. Hart-Smith faced in Charlotte (Ex. 5)—makes it an ideal environment for him to reset his life.

Further incarceration would undermine Mr. Hart-Smith's rehabilitation. Indeed, Congress has declared that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. Mr. Hart-Smith's relapse while incarcerated following his first violation proves this point. (Doc. 14 at 6.) That is why a Court cannot "impose or lengthen a period of confinement" to achieve rehabilitative ends, but must "consider whether an offender could benefit from training and treatment programs" when imposing a further term of supervised release. *Tapia*, 564 U.S. at 330; *see also* 18 U.S.C. § 3583(d) (requiring courts

6

to consider "the availability of appropriate substance abuse treatment programs . . . when considering any action against a defendant who fails a drug test").

Because an extended term of incarceration could impede Mr. Hart-Smith's successful rehabilitation by delaying access to needed treatment, the Court should sentence Mr. Hart-Smith to time served and require him to complete FIRST's long-term residential program. *See United States v. Grant*, 2021 WL 5412343, at *3 (4th Cir. 2021) (unreported decision) (affirming a decision to impose a term of incarceration lower than what the Court deemed justified by the defendant's conduct "to enable [the defendant] to complete a specific drug treatment program as a condition of supervised release").

## II. Further Incarceration Would Neither Protect the Public Nor Deter Future Criminal Conduct.

Incarceration beyond the nearly eight months Mr. Hart-Smith has already served would not provide any added protection to the public "from  further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Even the statutory maximum of 24 months would only keep Mr. Hart-Smith incarcerated for another 16 or so months. 18 U.S.C. § 3583(e)(3) (providing a maximum term of incarceration upon revocation of two years when the underlying offense is a class C felony).

Under these circumstances, the most effective way to protect the public is to focus on Mr. Hart-Smith's long-term rehabilitation. Indeed, North Carolina recognizes that "participation in educational and vocational programs, faith-based opportunities, family relationship supports, and treatment for behavioral health issues reduces rates of repeat offending and makes North Carolina safer and more prosperous." N.C. Exec. Order 303 (Jan. 29, 2024), https://governor.nc.gov/executive-order-no-303/open. Thus, allowing Mr. Hart-Smith to participate in FIRST's long-term residential treatment program contributes to protecting the public.

7

Neither would further incarceration be a better "deterrence to criminal conduct" than participation in the FIRST at Blue Ridge program. 18 U.S.C. § 3553(a)(2)(B). Mr. Hart-Smith has already been incarcerated for nearly eight months. After completing FIRST's year-long residential program, Mr. Hart-Smith will have spent nearly 20 months in a highly structured environment. That is two months longer than a bottom-of-guidelines sentence of 18 months, and roughly four months longer than the period of incarceration Mr. Hart-Smith would likely serve after accounting for good conduct time. *See* 18 U.S.C. § 3624(b)(1). Mr. Hart-Smith understands that he is asking for more time in a highly structured environment than he would likely receive under a guidelines sentence. He is requesting this sentence because he views it as a productive use of time and an investment in his future.

### CONCLUSION

Mr. Hart-Smith acknowledges that only he is to blame for the consequences of his decisions. He also knows that only he can decide to change the course of his life moving forward. However, this Court has the discretion to allow Mr. Hart-Smith to take the most direct path to rehabilitation. He therefore respectfully asks the Court sentence him to time served and require him to complete the year-long rehabilitation program offered by FIRST at Blue Ridge as a term of his ongoing supervision.

DATE: March 19, 2026                    Respectfully submitted,


*/s/ Chad F. Lee*
Chad F. Lee
N.C. Bar No. 56350
**CADWALADER, WICKERSHAM & TAFT LLP**
650 South Tryon Street
Charlotte, NC 28202
(704) 348-5113
Chad.Lee@cwt.com

*Attorney for Defendant*

8

## <u>CERTIFICATION OF COMPLIANCE WITH STANDING ORDER</u>

Counsel for Defendant hereby certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg, and every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

DATE: March 19, 2026    Respectfully submitted,


*/s/ Chad F. Lee*
Chad F. Lee
N.C. Bar No. 56350
**CADWALADER, WICKERSHAM & TAFT LLP**
650 South Tryon Street
Charlotte, NC 28202
(704) 348-5113
Chad.Lee@cwt.com

*Attorney for Defendant*